**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **TIM GUNTNER,** | ) | **CASE NO. 1:11CV0801** |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **MAGISTRATE JUDGE GREG WHITE** |
| | ) | |
| **COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION,** | ) ) | |
| | ) | |
| **Defendant.** | ) | **MEMORANDUM OPINION & ORDER** |

Plaintiff Tim Guntner ("Guntner") challenges the final decision of the Commissioner of Social Security, Michael J. Astrue ("Commissioner"), denying Guntner's claim for a Period of Disability ("POD") and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 416(i), 423, *et seq*. This matter is before the Court pursuant to 42 U.S.C. § 405(g) and the consent of the parties entered under the authority of 28 U.S.C. § 636(c)(2).

For the reasons set forth below, the final decision of the Commissioner is affirmed.

### I. Procedural History

On June 2, 2006,[1] Guntner filed an application for POD and DIB alleging a disability onset date of April 15, 2006, and claiming that he was disabled due to anxiety, depression, migraines, dyslexia, and a lumbar strain. (Doc. No. 107.) His application was denied both initially and upon reconsideration. Guntner timely requested an administrative hearing.

On December 5, 2008, an Administrative Law Judge ("ALJ") held a hearing during which Guntner, represented by counsel, testified. Thomas F. Nimberger, an impartial vocational expert ("VE"), also testified. On January 30, 2009, the ALJ found Guntner was unable to perform past relevant work, but that he had acquired work skills that were transferable to other

---

[1]The protective filing date was May 31, 2006. (Doc. No. 137.)

occupations. The ALJ found there were a significant number of jobs in the national economy Guntner could perform and, therefore, he was not disabled. The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied further review.

## II.  Evidence

### *Personal and Vocational Evidence*

Age 52 at the time of his administrative hearing, Guntner is an individual closely approaching advanced age under social security regulations. *See* 20 C.F.R. § 404.1563. (Tr. 26.) Guntner has at least a high school education and past relevant work as a registered nurse and an office nurse. *Id.*

### *Medical Evidence*

In September, 2004, Guntner sustained a lumbar strain while assisting a patient from a wheelchair. (Tr. 202.) He was treated conservatively and returned to work on light duty until November 8, 2004, when he was released to work with no restrictions. (Tr. 206-207; 214.)

In July, 2005, Guntner began treating with David Cogan, M.D., an internist, for depression, anxiety, and a lumbar strain.[2] (Tr. 220; 301-312.) On July 21, 2006, Dr. Cogan, in a letter to the Bureau of Disability Determination, noted as follows:

> Based on my examination in the office, my observation, and interactions with the patient, I do not believe that he is completely disabled from doing all consistent work. His work as an operating room registered nurse may indeed be too stressful for him given his problems with anxiety and depression; however, I would think that he could do less stressful work, perhaps even in the medical field. So it is not my opinion that he is completely disabled from all consistent work at the present time.
>
> Should this issue be in dispute, I would recommend an independent medical exam specifically by an M.D. psychiatrist, or a Ph.D. psychologist to evaluate his mental fitness for continuing work since I think that is probably the central issue to why he is having difficulty with employment.

(Tr. 220.)

On July 26, 2005, Richard Halas, M.A., performed a consultative psychological evaluation for the Bureau of Disability Determination. (Tr. 322-325.) A generalized anxiety

---

[2]The record reflects that Dr. Polster actually examined Guntner in July and August, 2005, as Dr. Cogan's name is crossed out and Dr. Polster's inserted on the office notes. (Tr. 307-312.)

disorder with occasional panic attacks, a depressive disorder, and a dependent personality disorder with histrionic characteristics and paranoid traits were diagnosed. (Tr. 324-325.) Halas assigned a global assessment of functioning ("GAF") score of 45.[3] (Tr. 325.) He opined that Guntner would not have significant problems with performing simple, one-to-two step instructions/directions/tasks. *Id*. However, he found that Guntner was markedly limited in relating to others including peers, supervisors, and the general public, and in withstanding the stresses and pressures associated with most day-to-day work settings. *Id*.

On July 27, 2006, state reviewing psychologist John Waddell, Ph.D., completed a psychiatric review technique form and a mental residual functional capacity ("RFC") assessment. (Tr. 222-239.) Dr. Waddell identified affective, anxiety, and personality disorders as severe impairments imposing moderate difficulties in social functioning and in maintaining concentration, persistence, or pace. (Tr. 222, 232, 237.) Dr. Waddell gave Mr. Halas' opinion less weight, finding it inconsistent with Dr. Cogan's statements and with Guntner's activities of daily living. (Tr. 238.) In November, 2006, Roseann Umana, Ph.D., reviewed the psychological evidence and affirmed Dr. Waddell's finding. (Tr. 326.)

On August 10, 2006, consultative examining physician Eulogio Sioson, M.D., noted that Guntner walked normally and was able to do heel/toe walk. (Tr. 246.) He was able to grasp and manipulate with each hand and had normal muscle strength. *Id*. While he had some decrease in range of motion in his neck flexion/extension and in his shoulders, he had no neck tenderness, and only complained of stiffness. (Tr. 241, 246.) He had minimal lower back tenderness with negative straight leg raising both in the sitting and lying positions. (Tr. 246.) Dr. Sioson's impression was that, despite complaints of dyslexia and depression, Guntner was able to maintain attention and concentration. *Id*. He appeared to be able to read well and fill out forms appropriately. *Id*. Dr. Sioson concluded that Guntner's only limitation was pain. *Id*. A lumbar

---

[3]A GAF score of 45 is indicative of serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g.., no friends, unable to keep a job). American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders*, 32 (Text Revision, 4th ed. 2000).

3

x-ray was obtained and revealed osteoarthritis with slight L5-S1 disc space narrowing, osteophyte formation and facet sclerosis. (Tr. 244.)

On August 21, 2006, state agency reviewing physician Charles Derrow, M.D., relying on Dr. Sioson's assessment, opined that Guntner could perform medium level work (occasionally lift 50 pounds, frequently lift 25 pounds, stand/walk about six hours in an eight hour workday, and sit about six hours in an eight hour workday). (Tr. 248-255.) In December, 2006, state agency reviewing physician Sarah Long, M.D., concurred with Dr. Derrow's assessment. (Tr. 262.)

Although Guntner stopped seeing Dr. Cogan in June, 2006, the Bureau of Disability Determination requested another report from him. On November 17, 2006, Dr. Cogan indicated that Guntner's alleged disability was based upon anxiety, depression, migraines, dyslexia, and lumbar strain. (Tr. 261.) Dr. Cogan, however, noted that he could not comment with clarity or certainty regarding Guntner's mental health as such a determination should come from a consultative psychiatric evaluation. *Id.* Dr. Cogan opined that as of the last office visit in June, 2006, he did not believe that Guntner's lumbar strain was, by itself, disabling. *Id.*

In January, 2007, at the request of counsel, Dr. Cogan examined Guntner and prepared physical and mental RFC assessments. (Tr. 269-272; 274-275.) Based upon patient history, he reported that Guntner was restricted to lifting/carrying ten pounds, standing/walking for one hour without interruption and two to three hours total out of an eight-hour workday, and to sitting for one to two hours without interruption and six hours total out of an eight-hour workday. (Tr. 269.) He also found that Guntner needed a sit/stand option and had moderate pain. (Tr. 270.) Regarding mental abilities, Dr. Cogan determined that Guntner had a good or fair ability to perform many mental work-related tasks, but had poor or no ability to function independently without special supervision, work in coordination with or in proximity to others, deal with work stresses, complete a normal workday and work week, and relate predictably in social situations. (Tr. 271-272.)

In February, 2007, Guntner began mental health treatment with Thomas Svete, M.D., who noted Guntner to be over-talkative and anxious, but also alert, cooperative, and with normal

4

thought content. (Tr. 266.) Dr. Svete's impression was possible type 2 bipolar disorder, possible ADHD, a possible reading disorder, and a mixed personality disorder. (Tr. 267.) He prescribed Zoloft. *Id.*

Guntner saw Dr. Svete four more times in 2007 (Tr. 277-281) and eight times throughout 2008 and 2009. (Tr. 337-339; 388-392.) While the treatment notes are largely illegible, in November, 2007, Guntner reported that he felt good. He also reported more activities, including swimming and running. (Tr. 278.) While there were office visits where Dr. Svete found Guntner to be depressed or anxious, there were other visits where he observed Guntner to demonstrate appropriate affect, normal thought content/processing, and normal psychomotor activity. (Tr. 277-281; 337-339; 388-392.) Dr. Svete refined Guntner's diagnoses to generalized anxiety disorder, bipolar disorder type 2, a learning disability reading disorder, a personality disorder and possible ADHD. (Tr. 277-284.)

Beginning in August, 2007 and continuing through July, 2008, Guntner received counseling services from therapist Glenda Kupersmith, LISW. (Tr. 328-336.) Notes indicate that Guntner had a job as an umpire throughout this time and his presentation was "unremarkable." (Tr. 328, 336.) At the sessions, Ms. Kupersmith focused on Guntner's poor social judgment and the negative effect it had on his interactions. (Tr. 328, 333, 336.) She considered Guntner's progress to be slow. (Tr. 328-330, 332-334, 336.) In November, 2007, Guntner reported that he felt better on medications, but expressed concerns related to his social security disability application. (Tr. 334.) In February, 2008, Guntner again expressed concerns about his disability application and brought in a disability form. (Tr. 332.) The treatment notes indicate that Ms. Kupersmith gave Guntner feedback relating to his functioning, but it appears that she did not complete the disability form. *Id.*

On January 25, 2008, Guntner was again examined by Dr. Cogan. No clinical examination findings were made with respect to Guntner's physical functioning. (Tr. 287-288.) In February, 2008, Dr. Cogan provided an updated physical RFC assessment, setting Guntner's limitations as follows: lift/carry ten pounds, stand/walk for one hour without interruption and two to three hours total out of an eight-hour workday, sit for one to two hours without

5

interruption and six hours total out of an eight-hour workday. (Tr. 290-291.) A sit/stand option was reported as necessary. *Id*. Again, Dr. Cogan's notes show that these restrictions were "per patient history." (Tr. 290.)

In October, 2008, Dr. Cogan, in a handwritten letter, stated that Guntner was "disabled from regular work," due to his recurrent prostatitis, recurrent back pain, migraine headaches, and based upon anxiety, depression, and mood disorder. (Tr. 340.) Dr. Cogan examined Guntner that day for his complaint of diffuse low lumbar tenderness, but the doctor made no clinical findings with respect to Guntner's functioning. (Tr. 341.)

### *Hearing Testimony*

At the hearing, Guntner testified as follows:

- After working as a licensed practical nurse for awhile, he returned to school to become a registered nurse. (Tr. 33-34.) He also has worked as an operating room nurse. (Tr. 34.)

- He last worked as a registered nurse in April, 2006, but currently umpires baseball and softball. (Tr. 35.) He first began umpiring approximately 25 years ago, after he was first married. *Id*. About six years ago, umpiring became difficult for him due to his back and emotional problems. (Tr. 36.) He continued to umpire, but for less stressful leagues, such as for the 50-and-over men's, children's, and women's leagues. *Id*. He tried to umpire high school games, but those were too competitive for him. *Id*.

- After undergoing a performance review, he was essentially forced to resign from his nursing position to avoid being fired. (Tr. 37-39.)

- He identified his disabling impairments as migraine headaches, back injuries, dyslexia, anxiety and depression. (Tr. 40-46.)

- His activities of daily living include fixing meals, watching television, walking for exercise, attending local basketball games, and doing some housekeeping. (Tr. 49.)

### III. Standard for Disability

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a

continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).[4]

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

Guntner was insured on his alleged disability onset date, April 15, 2006, and remained insured through December 31, 2011. (Tr. 15.) Therefore, in order to be entitled to POD and DIB, Guntner must establish a continuous twelve month period of disability commencing between those dates. Any discontinuity in the twelve month period precludes an entitlement to benefits. *See Mullis v. Bowen,* 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F. 2d 191, 195 (6th Cir. 1967).

### IV. Summary of Commissioner's Decision

The ALJ found Guntner established medically determinable, severe impairments, due to degenerative disc disease, migraine headaches, generalized anxiety disorder, major depressive disorder, and personality disorder; however, his impairments, either singularly or in combination, did not meet or equal one listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. Guntner was found incapable of performing his past work activities, and was determined to have a Residual Functional Capacity ("RFC") for a limited range of medium work. The ALJ then used the Medical Vocational Guidelines ("the grid") as a framework and VE testimony to determine that Guntner is not disabled.

---

[4] The entire process entails a five-step analysis as follows: First, the claimant must not be engaged in "substantial gainful activity." Second, the claimant must suffer from a "severe impairment." A "severe impairment" is one which "significantly limits ... physical or mental ability to do basic work activities." Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets a required listing under 20 C.F.R. § 404, Subpt. P, App. 1, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000). Fourth, if the claimant's impairment does not prevent the performance of past relevant work, the claimant is not disabled. For the fifth and final step, even though the claimant's impairment does prevent performance of past relevant work, if other work exists in the national economy that can be performed, the claimant is not disabled. *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

### V. Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has been defined as "[e]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see also Richardson v. Perales*, 402 U.S. 389 (1971).

The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached. *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether the proper legal standard was applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations or failure to provide the reviewing court with a sufficient basis to determine that the Commissioner applied the correct legal standards are grounds for reversal where such failure prejudices a claimant on the merits or deprives a claimant of a substantial right. *See White v. Comm'r of Soc. Sec.*, 572 F.3d 272 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006).

## VI. Analysis

Guntner contends that the ALJ erred in his analysis of the medical source opinions relating to his physical and mental functioning.

Under Social Security regulations, the opinion of a treating physician is entitled to controlling weight if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record." *Meece v. Barnhart*, 192 F. App'x 456, 560 (6th Cir. 2006) (*quoting* 20 C.F.R. § 404.1527(d)(2)). "[A] finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009) (*quoting* Soc. Sec. Rul. 96-2p, 1996 SSR LEXIS 9 at *9); *Meece*, 192 Fed. App'x at 460-61 (Even if not entitled to controlling weight, the opinion of a treating physician is generally entitled to more weight than other medical opinions.) Furthermore, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927." *Blakley*, 581 F.3d at 408.[5]

Nonetheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence. *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581 F.3d at 406 ("It is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with other substantial evidence in the case record.") (*quoting* SSR 96-2p).

---

[5] Pursuant to 20 C.F.R. § 404.1527(d)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

Moreover, the ALJ is not bound by conclusory statements of a treating physician that a claimant is disabled, but may reject such determinations when good reasons are identified for not accepting them. *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan v. Secretary of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986); *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir.1984). According to 20 C.F.R. § 404.1527(e)(1), the Social Security Commissioner makes the determination whether a claimant meets the statutory definition of disability. This necessarily includes a review of all the medical findings and other evidence that support a medical source's statement that one is disabled. "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled." *Id*. It is the Commissioner who must make the final decision on the ultimate issue of disability. *Duncan*, 801 F.2d at 855; *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Watkins v. Schweiker*, 667 F.2d 954, 958 n. 1 (11th Cir. 1982).

Guntner asserts that the treating physician's opinions were not properly weighed, especially the January, 2007 and February, 2008 reports in which Dr. Cogan found Guntner was restricted to lifting/carrying ten pounds, standing/walking for one hour without interruption and two to three hours out of an eight hour workday, and to sitting for one to two hours without interruption and six hours in a day. (Doc. No. 12 at 10-11.) Guntner further contends that the ALJ misinterpreted Dr. Cogan's belief that Guntner was "disabled from regular work." (Doc. No. 12 at 11.) He contends that Dr. Cogan's report actually identified physical restrictions consistent with sedentary functional capacity. *Id*. This, he argues, is reversible error as Guntner's vocational profile, combined with a sedentary RFC, would result in a finding of disabled under 20 C.F.R. Part 404, Subpart P, Appendix 2, Rule 201.14.[6] (Doc. No. 12 at 11-12.)

Regarding mental limitations, Guntner asserts that he is more restricted than what the ALJ recognized. (Doc. No. 12 at 13-14.) Specifically, Guntner contends that the medical evidence

---

[6]Rule 201.14 provides that an individual who is closely approaching advanced age, limited to sedentary functioning, with at least a high school education, and who is skilled or semi-skilled (but are not transferable) is disabled.

10

does not support a finding that he could interact with others or deal with work stress and pressure sufficiently to sustain work activity. (Doc. No. 12 at 14.)

The Commissioner maintains the ALJ properly weighed the evidence, including Dr. Cogan's opinions, to determine that Guntner was not disabled (Tr. 340.)

The ALJ, after discussing in detail Dr. Cogan's statements and questionnaires regarding Guntner's disability, concluded as follows:

> Dr. Cogan's opinions are inconsistent with each other and the inconsistencies are not explained by his opinions, his treatment notes, or by the evidence as a whole. In July 2006 and November 2006, Dr. Cogan indicated that Mr. Guntner was not disabled due to his physical impairments (Exhibits 2F and 10F). Dr. Cogan did not explain in his January 2007 and February 2008 opinions why Mr. Guntner had such significant limitations, other than to refer to Mr. Guntner's history (Exhibits 13F, p. 2 and 17F, p. 2). Dr. Cogan's October 2008 opinion is conclusory and he offers no objective data or explanation why Mr. Guntner's combination of impairments is disabling. I also note that in July 2006 and November 2006, Dr. Cogan indicated that he did not feel he was in a position to assess Mr. Guntner's mental capacity (Exhibits 2F and 10F); however, he did so in the January 2007 mental capacity questionnaire and provided no basis for his opinions. Due to the inconsistencies and the lack of objective data to support his January 2007, February 2008 and October 2008 opinions, I have given Dr. Cogan's opinions less weight. However, I gave some weight to Dr. Cogan's July 2006 opinion that Mr. Guntner may not be able to return to his work as an operating room nurse due to the stress level, but may be able to return to less stressful work, because that opinion is consistent with the evidence.
>
> Dr. Cogan's later statements expressing an opinion that Mr. Guntner is disabled are not supported by or consistent with the evidence as a whole. Mr. Guntner has sought relatively little treatment for his back pain. No physician has deemed the clinical signs to warrant any updated objective radiographic testing since 2006. In August 2006 there was evidence of slight narrowing at L5-S1, according to the consultative examiner at Exhibit 6F. There is EMG/NCS evidence of right cervical radiculopathy at C6-7 and C7-T1, but this test was performed on or about February 24, 2005, which means that Mr. Guntner worked as a nurse with it, and there is no evidence that it interfered with his ability to perform his job, or that it subsequently worsened. Therefore I do not accept Dr. Cogan's opinion at Exhibit13F that fine manipulation would be limited to an occasional basis or that gross manipulation would be limited to a frequent basis. No treating source has ever offered surgery. The only treatment offered has been conservative treatment and temporary physical therapy. Narcotics in the form of Darvocet and Vicodin have been prescribed, but only for acute pain episodes, not for daily use, and Mr. Guntner admitted he does not take them daily. Exhibit12F, page 3. Mr. Guntner's musculoskeletal physical examination at a consultative examination was essentially normal. Exhibit 6. Dr. Cogan diagnosed only a lumbar strain. Exhibit 2F. Mr. Guntner testified that he has episodes of back pain that incapacitate him for 3 days at a time 3 to 4 times per year, but he engaged in substantial gainful activity in the past despite this pattern, and the medical evidence does not document this frequency, duration or severity, and neither does it document any worsening in the frequency, duration and severity since Mr. Guntner stopped working. It is important to note that Mr. Guntner did not stop working due to back pain. For all these reasons, I do not give great weight to Dr. Cogan's medical source statements at Exhibits 13F, 17F and 25F.

11

> I find that Dr. Cogan's treatment notes do not support the number of "fair" or "poor to none" limitations that he checked off in the mental medical source statements he completed. I acknowledge that the consultative psychologist found a GAF of 45, and Dr. Steve[7] also found a GAF of 45 on February 14, 2007 (Exhibit 12F, page 2) and again in April 2007, but this was at the initiation of treatment, and page 5 of the same exhibit, on the same date, contains Dr. Steve's plans to optimize medications in the future, so I cannot find that Dr. Steve expected Mr. Guntner's mental functioning to remain permanently fixed at the level indicated by a GAF of 45. In addition, Dr. Steve's later treatment notes after April 2007 do not indicate a GAF of 45. See Exhibit 15F. The rest of the evidence, as discussed more fully below, also demonstrates that Mr. Guntner's mental functioning did not persist at that degree of impairment. Mr. Guntner has never required hospitalization for psychiatric reasons. He testified that he takes Zoloft and Clonopin, and that he has been taking those medications since the summer before he quit working.

(Tr. 22-23.)

In addition, the ALJ discussed Mr. Halas' July 2006 evaluation, giving it less weight after finding it was inconsistent with the evidence as a whole. "Mr. Halas's opinions that Mr. Guntner has marked limitations in relating to others and withstanding stress is inconsistent with Mr. Guntner's own reports that he is able to drive, shop, attend basketball games at the local high school, go to the bookstore and meet people, and umpire softball games during the season (Exhibits 3E and 11E and Mr. Guntner's testimony during the December 2008 hearing)." (Tr. 23.)

After reviewing the other medical evidence, the ALJ found Guntner's RFC to be as follows:

> After careful consideration of the entire record, I find that Mr. Guntner has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) with restrictions. Specifically, he can lift and carry up to 50 pounds occasionally and 25 pounds frequently. He can stand and/or walk for a total of six hours in an eight-hour day. He must be able to change between sitting and standing for a minute after doing so for one hour. He is limited to simple, routine tasks that can be performed independently. He is limited to superficial interaction with co-workers and supervisors. He cannot perform work requiring direct interpersonal interaction with the general public. He cannot perform work requiring rigorous production quotas or super fast paced work. He cannot perform work requiring more than occasional reading.

(Tr. 23.)

The ALJ, applying the factors found in §404.1527(d)(2), determined he would not give

---

[7]The ALJ referred to Dr. Svete as Dr. Steve.

12

great weight to Dr. Cogan's opinions. The ALJ found that they were inconsistent with the record as a whole and lacked objective data to support them. When completing the questionnaires, Dr. Cogan provided no medical data to support his conclusions, other than to generally cite to Guntner's past history. As expressed by the ALJ, Dr. Cogan's earlier medical notes do not support his opinions. The ALJ further noted that Dr. Cogan was not qualified to assess Guntner's mental capacity. *See Harris*, 756 F.2d at 435; *Bogle*, 998 F.2d at 347–48; *Blakley*, 581 F.3d at 406 ("It is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with other substantial evidence in the case record.") (*quoting* SSR 96–2p). Moreover, the ALJ did not need to accept Dr. Cogan's statement that Guntner was "disabled from regular work." *See Duncan*, 801 F.2d at 855; *Harris*, 756 F.2d at 435.

Regarding Guntner's mental restrictions, the ALJ properly concluded that Guntner's own statements and conduct contradict his assertion that his impairments are disabling. The ALJ gave less weight to Mr. Halas' opinion as it was inconsistent with the other evidence. The ALJ gave full weight to Drs. Waddell and Umana, the state reviewing physicians, who found Mr. Halas' opinion was inconsistent with Guntner's reported activities of daily living. The ALJ described Guntner's daily activities as follows:

> At the hearing, Mr. Guntner stated that he engages in few activities of daily living aside from watching television, performing limited household chores, and attending a high school basketball game. The record indicates that Mr. Guntner engages in activities consistent with the residual functional capacity stated above. In July 2006, Mr. Guntner told Mr. Halas that he spends his days reading the newspaper, working on bills, watching television, doing household chores, swimming or riding his bike, going to [sic] a walk, and doing yard work (Exhibit 21F, p.3). He has continued to work as an umpire during the season since his alleged onset date. Mr. Guntner testified that his mother died in October 2006. Prior to her death, the evidence indicates that Mr. Guntner cared for her. In a June 2006 statement, Mr. Guntner stated that his mother was 83 and that he had to take care of her by doing the housework, shopping, taking her out to eat, and checking her bills (Exhibit 3E, p.2). In that same statement, Mr. Guntner reported that he was able to care for his personal needs, cook, drive, ride a bike, and that he liked to go to the bookstore and meet people. In October 2006, he also reported that his daily activities included swimming at the YMCA (Exhibit 11E, p.2). He stated that his social activities included talking on the phone and visiting with friends, watching high school sports, going to the bookstore, and going to the park on the weekend with friends (Exhibit 11E, p.5.)

(Tr. 25.)

Additionally, although Guntner's therapist Ms. Kupersmith, found his progress to be slow in terms of social judgment and interactions, she never completed a disability form on his behalf. (Tr. 328, 332, 333, 336.)

Guntner argues that the ALJ's opinion was not supported by substantial evidence. A claimant does not establish a lack of substantial evidence merely by pointing to evidence of record that supports his position. The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772–3 (6th Cir. 2001) (*citing Mullen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389–90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached. *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)). Therefore, Guntner must demonstrate that there is insufficient evidence in the record to allow a reasoning mind to accept the ALJ's finding. Guntner cites medical information of record that he suggests supports a finding that he is disabled, but he has failed to draw this Court's attention to any actual deficiency in the ALJ's reasoning or a lack of evidence supporting the ALJ's position. As such, Guntner's arguments are without merit.

### VII. Decision

For the foregoing reasons, the Court finds the decision of the Commissioner supported by substantial evidence. Accordingly, the decision of the Commissioner is affirmed.

IT IS SO ORDERED.

s/ Greg White<br>United States Magistrate Judge

Date: March 20, 2012